Today is Meitav Dash Provident Funds v. Spirit AeroSystems 22-5013. Before you start, what do you guys find, closing that? Good morning, Your Honor. May it please the Court, my name is Irina Vasilchenko of Labatton-Sushero here on behalf of the plaintiffs' appellants, and I'd also like to try to reserve three minutes of my time for rebuttal today. This is an appeal from a 12B6 dismissal of a securities fraud class action alleging claims under Sections 10B and 28 of the Exchange Act, alleging two different categories of misstatements. First, we have misstatements reaffirming Spirit's 52-per-month production rate of ship sets for Boeing's 737 MAX planes, which were Spirit's most important product that generated over half of Spirit's revenues during the class period. Given the FAA's grounding of the 737 MAX earlier in 2019, Spirit's continued ability to produce at this 52 rate was critical to investors, and that's why analysts repeatedly kept asking defendants about this, whether there were any changes in production on various earnings calls before and during the class period. On that day, so the first day of the class period, on the earnings calls, defendants repeatedly reaffirmed the 52-per-month production rate, including in response to direct analyst questions about whether or not there were any changes in production looming on the horizon. For example, defendant Gentile, the CEO of Spirit, reassured investors... This is the October 31st call? Yes, the first day of the class period. He reassured investors we're going to be at 52 for an extended period of time. These statements were false and misleading, because according to former employees of the company, just weeks earlier, Boeing had secretly told Spirit to reduce that production rate in half. Okay, and so your allegation from FE7 is that Boeing had told Campbell. Yes. Right. Ms. Little and Mr. Campbell tell FE7 that. What in the complaint indicates that Campbell told Gentile about the production cut, other than the layoff reports? Other than the layoff reports. Well, we have allegations that defendant Campbell regularly reported to defendant Gentile about 737 MAX production, including on a daily basis. There were also monthly executive meetings where the 737 MAX production rate was discussed, where defendant Campbell would present on any updates related to this program. So given that the senior executive, defendant Campbell, who knows of the cut, would then conceal a 50% cut in production in Spirit's most important product from defendant Gentile in reporting to him on a daily basis, we believe that that stretches credulity, Your Honor. So we also have the layoff analysis, which you just alluded to, because that's a direct link from FE7, that the fact of the cut was directly communicated to defendant Gentile. But the layoff reports, it seems to me that you have a greater challenge on the layoff reports, since Gentile specifically told in his earnings call on October 31st that Spirit was conducting a number of reports, potential layoffs, depending on what Boeing ended up doing. No, Your Honor, that is not correct. I think you're buying into defendant's interpretation of defendant Gentile's statements on the call. If you actually look at the verbatim statements, he talked about, so the analyst asked him, well, you know, what happens if Boeing goes down to 30 in production? How does that affect your production? Are you guys thinking about this? Are there any changes? And defendant Gentile said, no, there are no changes. We're going to produce at 52 for the extended period of time. But we are running analyses, you know, in case Boeing goes down, you know, what happens to our production rate, which is a prudent thing to do. I fully agree with you. But he did not tell investors that they were currently running a layoff analysis to implement a 50% production cut. Oh, yeah. And if you get back and look at what FE7 actually said, that what Boeing communicated to Spirit at one of their regular meetings was that Spirit had to cut production in half. There was no ambiguity. There was no, you know, consideration, possibility, oh, maybe we'll cut it by a third or by a fourth. It was, you're going to cut production in half, and we're giving you a heads up. And Spirit immediately started implementing the new revised production plan based on that 50% production cut. That plan, you know, so the analyses of the layoffs was part of that plan, right? They have to figure out how many workers they need to get rid of to produce at this much lower rate. And FE7 gave a lot of additional details that, you know, really bolster the reliability of her account. She said that the initial round of layoff analysis was communicated to Defendant Gentile about two to three weeks after Boeing first communicated the cut. And she said that the cut was communicated around late September, beginning of early October. So two to three weeks from that puts you right before the end of October. So that's why she was so certain that Defendant Gentile actually knew about this information, at least through the layoff analysis, before he made his misstatements on October 31st. Does your problem with the district court more a matter of not giving you the benefit of what you say otherwise would stretch credulity, as opposed to what the law is? In other words, the district court got the law right. Exactly. Your problem is that you have these FEs who say this, this, and you put all of the pieces together and say, here's the picture and the picture's good enough. And the district court says, with Janice and other reasons, it's not good enough. The pieces don't fit. So you're just telling us now all of the reasons that you think that the pieces fit rather than the district court made any legal errors, right? Well, Your Honor, I disagree with that because we do believe that the district court misapplied the standard for evaluating these kind of former employee allegations under the PSLRA. Even though there is a heightened pleading standard under the PSLRA and Rule 9b, that standard does not mean that we have to plead evidence in our complaint. And this court has recognized this principle in the Adams decision that we cited repeatedly through our briefing. You know, the PSLRA was not designed to make meritorious cases impossible to bring. And if you look at the court's decision, I think it really is applying a standard of particularity that is so detailed and granular that it's impossible to meet at this early stage before discovery, before we have access to the company's internal documents and witnesses. And we believe that we have more than satisfied the standard here because we have a reliable, well-positioned former employee who was directly involved in these layoff analysis. You know, she wasn't – she didn't just overhear this at the office water cooler. You know, that would be the kind of unreliable hearsay that can and should be dismissed. Here, she provided data for these layoff analysis. She was tasked to do that. So she was directly involved with this work. She also worked directly for SVP Brown, who was the senior executive who actually presented those layoff reports to defendant Gentile. But I don't think you've alleged that Brown told FE7 that Boeing had told Brown that they were going to cut to 42. We allege that Brown was also in that key Boeing meeting where Boeing communicated the production cut. She said that Brown always attended those meetings because he was the head of all the Boeing programs. And defendant Campbell actually reported to defendant Brown – not defendant Brown, SVP Brown. Brown reported to Campbell. So she said that she herself personally learned of the production cut from defendant Campbell and Little when they had their weekly performance meetings, and they debriefed her and other business operations specialists on the Boeing meeting where they had just communicated the production cut. Do you ever allege in the complaint who it was from Boeing that had told Campbell about the cut to 42? We don't allege who it was. We don't believe those kinds of details are necessary. What if it was the janitor? The janitor? No, I don't mean it facetiously. Just from reading your briefs and the other side's briefs, much less the complaint, there is all of this intrigue with analysts. The Jeffries Report analysts all over the country are wanting to know what is going to happen. Spirit is a huge publicly traded company, and the grounding of the 737 MAX is a big deal. And so I can imagine that there are all sorts of rumors about what Boeing is going to do. And so I can see that maybe it was the director of sales that said, I think the CEO of Boeing is going to cut it, is going to make this cut. Well, we do have detailed allegations about who from both sides, Spirit and Boeing, attended these regular Boeing meetings, and it was attended by senior executives on Boeing's side. So I don't believe a janitor would be in the room for the Boeing meetings, with due respect. You never know. We don't know. But at this stage, I do believe that the complaints allegations are supposed to be taken as true and viewed favorably to the plaintiffs. And with respect, we believe that the district court did not do that here. And a recent decision from this court, Pluralsight, which we submitted a notice of supplemental authority, reinforces these principles, that you are, despite the PSLRA heightened pleading standard, you're still supposed to treat a complaint under 10B in the same way as other claims. And these kinds of inferences that you're now drawing should not be viewed against plaintiffs here. So in addition to FE7 accounts, we do have other allegations, and those allegations are to be viewed holistically, not divided and conquered, as the district court did here. And one of those important sets of other allegations is core operation allegations, that this was a core product of Spirit that constituted more than 50% of its revenue. So, of course, common sense supports that the CEO of the company would know of a drastic production cut in one of its most important products. And the Pluralsight decision reinforced, just reaffirmed this common sense point. Also, close monitoring allegations. Here, Defendant Gentile also repeatedly told investors and analysts that he personally closely monitored the production rate, that he worked closely with Boeing on the production rate. So these kinds of repeated representations by the CEO were also an important factor, showing scienter in the Pluralsight decision, and we have that here. In addition to that, we also have, you know, the fact that Defendant Campbell knew. Given that Defendant Campbell, the head of the most important program, knew, and he regularly, daily communicated with Defendant Gentile about it, it is inconceivable that he didn't tell Defendant Gentile about that. And the Adams decision again from this circuit makes clear that one defendant's knowledge is an important link in the inferential chain that the CEO defendant knew. But Anderson says that you can't infer scienter from simply a person's position within the company. That is true, but it also says that it is very much a relevant fact, and Adams actually found the CEO defendant's scienter pled, even though there was no direct link of his knowledge based on former employee allegations or anything like that. They inferred his scienter based on the fact that the CFO directly knew of the accounting violations, and given that the CFO reports up to the CEO, it was an important link establishing the CEO's scienter as well. So we have that as well. You know, Wade, when you view all of these facts together, we believe that we've pled a strong inference of scienter. Would you like me to get to the internal controls, Brad? Time is yours. Just quickly, because that is the other obviously key set of statements, where the district court also found that we had pled with requisite particularity the falsity of those internal controls and accounting statements. Again, based on former employee allegations. And here we had arguably even stronger direct links to the individual defendant. Specifically, one of the FEs, FE9, directly confronted defendant Gilson at a meeting before the misstatements were made. He raised his concerns about defendant Campbell's manipulation of the EAC cost numbers for the 737 MAX. But Gilson downplayed that, said, you know, you're making a mountain out of a molehill. So according to your complaint... That's not true, Your Honor. Well, okay. Okay, well, let me ask my question and then tell me all of the flaws with it. Sorry, Your Honor. But in any event, I thought that you had alleged that Gilson had downplayed FE9's complaints, which makes it unlikely to me, even viewing the allegations of the complaint favorable to the plaintiff, that Gilson would have communicated FE9's concerns about the EAC misdoings to Gentile. Or to Garcia. I mean, if you look at the actual complaints allegations as to what FE9 said happened at the meeting, he said that if Gilson shut him down, you know, did not start any kind of internal investigation or anything like that  And, Your Honor, we believe that that shows a reckless indifference to the truth. You know, that is not something when you are confronted by a former employee who is in a position of management in the finance department, who directly is supposed to provide input on these kinds of Boeing claims numbers to the finance and program personnel about what the likely resolution of those EAC claims will be. You know, if he disregards this person's concerns that were raised repeatedly. And FE9 then resigned in protest in large part due to Gilson's failure to actually investigate. It was only in December of 2019 that the company apparently began an investigation based on another whistleblower account. It is my fault. But what I was trying to ask was, well, based on all of that, why would we think that Gilson communicated these concerns to either Garcia, the CFO, or the CEO? Yes, Your Honor, because Gilson, again, reported directly up to the CFO Garcia. And Adams, once again, says that there is an important link in the inference chain when one of the defendants who reports up to the other defendant knows that strengthens the answer. And both resigned directly as a result of these accounting violations. And management changes were part of the remedial measures that the company then admitted to in fixing this material weakness. Yeah, so I mean, why would we think that he would have said, okay, CFO, CEO, I just want to tell you that I have been cooking the books. I'm trying to make it look better on the EAC. I've been underestimating these likely claims. And so because you are the CFO, I feel obligated to tell you that. He would be communicating his own wrongdoing. It would not be Gilson's own wrongdoing. It would be Campbell's wrongdoing. Campbell was the defendant who actually engaged in the EAC shenanigans. And Campbell was also fired at the same time as the other two defendants. So I think that's where, you know, Campbell is a central figure in both frauds. So I think it's a little difficult to keep him straight. And the standard, Your Honor, again, is not intentional deceit. It's a recklessness, which is a reckless disregard that your statements might mislead investors. And when you as the CFO and the controller and the principal accounting officers are directly confronted with serious red flags and violations of the accounting processes, and you don't even start an internal investigation to see if there's any validity to these concerns, I think that shows a reckless disregard for the truth. And that pleads a strong inference of scienter. Yes. It may not even be on your top ten chart, the leave to amend issue. Yes, Your Honor. Are you still asserting that? We believe that it was an abuse of discretion for this judge to not grant us leave to amend under the particular circumstances of this case, because this was our first amendment request. There was no oral argument. There was no delay, nothing like that. And this was on an issue of scienter, which is highly fact-intensive, and therefore would not be futile. You don't address the defendant's argument. Because they cite, it appears, strong circuit precedent that says if you just put it as a tag-on in a response to motion to dismiss and you don't explain exactly why you want to amend so that the district court can consider that, that you're out of luck. It's insufficient. And then in your brief, you mention a new former employee, and I read that, and I guess I'm not completely overwhelmed that that's going to change the district court's mind. But can you swim to this flotation device? Convince me that you are entitled to leave to amend on an abuse of discretion standard. I just want to, before everyone leaves court, I want to make sure you had your chance to convince me. Thank you, Your Honor. I appreciate that. So this new witness that we identified will go directly to curing the alleged deficiencies that the district court identified here, which was the lack of scienter, at least on the internal controls accounting fraud. Because this new witness was an internal corporate auditor at Spirit, and he said that certainly as FE9 and FE10 alleged, Spirit uncovered this accounting violation as a result of another whistleblower who said that he had been an accountant who had been pressured to sign off on the EAC numbers. And as part of that audit that EY then did, they found email chains between defendant Gilson, defendant Garcia, and that whistleblower accountant showing their knowledge. Exactly. And I see that. Can I speak? Yes. Sorry, Your Honor. I see that in your brief where you say uncovering email chains between Garcia, Gilson, and the account. That is so vague. And here we are in this area where specificity is the rule that must be followed. And if that's the best that you can do, faced as you are with potential final dismissal, why would we send that back for the district court to allow you to amend? Well, Your Honor, I think because we were at this time not putting forth an amended complaint, we would add the requisite details to show what exactly these emails said and how they implicated defendant Gilson and Garcia's knowledge. Why are you keeping your card so close to the vest? Why would you not tell us so that we can consider that and then assess what the district court might do with that information? Sorry, Your Honor. Honestly, I don't have in front of me exactly what this witness said. But the point was that Gilson and Garcia were directly informed by this accountant, whistleblower, of the same concerns about the EAC numbers that FE9 talked about. And that was done well before the misstatements and before the company learned about it through this audit that was done by Ernst and Young, the outside auditor. Thank you. You've answered my question. I didn't want to extend it too long, but I appreciate your answer. Thank you very much, Your Honor. Okay. Thank you. May it please the court, I'm John Wander. I'm working today for the Collective Appellees. I want to jump right to something Judge Bacharach was talking about, and that is that there is a swirl here of allegations about what happened, but there's not a connection to the actual speakers, which is what is required under the PSLRA. Connection to what? To the actual speakers. Speakers. To Tom Gentile, the CEO, to Jose Garcia, the CFO, the people who were talking to the market and signing the documents that are at issue here with the alleged misstatements. There's not that connection. There's not a connection that says former employee number seven was heard about a meeting, started to put input into a layoff analysis, and then what she says after that is the layoff analysis needed to get approved by Brown. We don't know if that happened. The layoff analysis then, if Brown approved it, would have gone to Tom Gentile. If they had evidence, if they had a corroborating witness who knew that Tom Gentile got a layoff report that reflected it, that there was a cut, a 50% cut directed by Boeing, we would have heard that. It would have said Tom Gentile received the layoff analysis. Is it really important that Tom Gentile received the layoff analysis? Isn't it just important that he knew about the cut? I agree with that. Can't we just assume that from plain old common sense? I don't think you can, Judge Moritz, and I think it's in part the PSLA burdens here. If you go to core operations, which is really the common sense argument, there's a lot of information happening at this company, and this is important information. It's the most important. There's nothing. I mean, it's exceedingly material. And he's the CEO. He is the CEO. And the Tenth Circuit on this has rejected the notion countless times, not countless, I'll count for you, in Zagg, in Anderson, in Fleming, the notion that knowledge of a person may be imputed solely from the individual's position within the company. The Tenth Circuit's standard on that is that to establish scientry, you have to combine detailed allegations about the defendant's actual exposure to information with that broader,  He's got people who are talking to Boeing that are informing him. What you don't have in this case is where I started. You don't have the allegation, the particular allegation, that the person we're talking about received notice of that. And it's because they can't get it. But he didn't receive notice that there was going to be a 50% cut. Well, I'm not conceding the fact that there actually was. They plead that. Okay. Right? I'm not conceding the fact that they actually had notice there was going to be 50%. Okay. And that's a place for me to go to an aside for a second. We talk in our briefs about the Boeing public pronouncements about this. And the trial court said, you're asserting those comments from Boeing executives for the truth of the matter that Boeing was not going to cut. The inquiry before the trial court on scientry is, what was in Tom Gentile's state of mind? What did Tom Gentile know? Those Boeing statements made at this same time are made public. It goes to, it's the classic, you're in a trial court, and it's a hearsay exception. Right? It's the classic, I heard it. I don't care if it's true or false what Boeing said. I heard Boeing say it. And it corroborates in my mind as the speaker here that we're not going to have a cut. But those were not in the complaint. I'm sorry, not in the complaint. Yeah. Are you talking about the Boeing statement? Yes. That's right. And we take the position that the trial court could take public or judicial notice of that because it was in the public record as statements made by Boeing. And the court didn't actually get to the point and say, I cannot take judicial notice of that. The court said, you're asserting it for the truth of the matter. You're asserting it as contrary to these facts that FE7 suggests, and I'm not going to listen to it for that purpose. Okay. But that's not really what we're presenting it for. We're presenting it for Tom Gentile's state of mind. And you don't need to get to the question of was FE7 right, that there were these layoff analyses that were a proxy for 50% cuts, right? There's not an allegation that someone said to Tom Gentile there are going to be 50% cuts. What there is is there was a layoff analysis that if you read it and you got it, it would reflect that there was going to be a 50% cut. And these are the transcripts of what Boeing said? Yes. Well, no, what I'm talking about is FE7. No, no, but the additional documents that you're relying on. Right. And they were in the record. We put them into the – And I assume that along with the transcripts, there was some authenticity, authentication by the court reporter or whoever transcribed those? You know, Your Honor, I don't know the answer to that question. I think the answer is no. I mean, they're attached to our – as you can take judicial notice, they're printed out. I don't know that we authenticated that. Could have been a secretary, you know, we don't know. Yeah, yeah. My point about those statements is we're getting to Tom Gentile's state of mind. And Tom Gentile's state of mind is a critical aspect here. It's in the standard for your question about core operations, Judge Moritz, you have to have a statement that he knew, right? You have to have that allegation. And there's one allegation in this case that information made its way to Tom Gentile directly. And that allegation is flawed because it wasn't actually directly. And that's – the trial court did a good analysis of that. And it followed Anderson. And in following Anderson, you know, the two points of Anderson that matter here, to create an inference of scienter based on reports, the plaintiff must adequately describe the contents of the reports. We don't have that here. She never saw the reports. She was a data person who provided some information that went into some reports that she says were created. And the other piece of it that matters is the confidential witnesses, this is from Anderson, where the confidential witnesses allegations did not establish the executive's knowledge because they did not establish the executives had seen the report or were aware of the reported losses. What we don't have is that allegation in this case. They can't get to that. There's not anywhere in the complaint, you can scrub the complaint, you can't see an allegation that Gentile was told there's a 50% cut coming. You can't see an allegation that Garcia was told there's a 50% cut coming because it didn't happen. And I'll roll with the trial court and assume that that conversation did happen. You offer the alternative, Judge Bachrach, in your question about the janitor. And I leaned over to my associate and I said, did we actually say that in our brief? Because that's the hypothetical we were spinning out yesterday. He said, no, he came up with that. Your sales director is a good one, too, right? Because who knows who says from Boeing we're going to do a 50% cut? Well, but I thought the answer was hopefully good, was, well, this was the senior management that was in the meeting. Yeah, but what level of senior management and what are they saying? We don't know. We don't know what was said in that meeting. Other than a blind quote, you're going to do a 50% cut. What you also know is your alternative explanation, right? What you know from your alternative explanation is Tom Gentile did tell the market on October 31st when the question was asked, if Boeing cuts this, it's a big deal to you, right? What are you doing to prepare for that? We're running analyses. We're preparing in case it happens. If it happens, we'll be prepared to deal with it. That's what he says. I'm paraphrasing. But that's what he says in that earnings call, and that's in the record, what he said there. That's the alternative explanation. Maybe there are some analyses going on, but they're not analyses that are getting to Tom Gentile's desk as Boeing said that we're cutting 50% of our operation. So I think that the trial court got it exactly right in analyzing the Anderson factors and saying, yeah, this doesn't show that the report had the level of detail necessary that it got to the executive in question. Okay. And so let me talk a little bit about the Jeffries Analyst Report and really why does Rule 9 matter in this context, right? It does matter in this context because what you had in the Jeffries Report, and this is the Jeffries Analyst Report, which is a very long, and it's in the record at 348 of Volume 2 of the appendix, is the Jeffries Report. And the Jeffries Report is 30 pages long. It's very detailed. It's the annual Jeffries Report on what Spirit's going to look like in the next year. It comes out internally at Jeffries on November 21, 2019. It's published on November 24 or distributed to its investors on November 24. And we don't know when the meeting happened, but they say the Spirit executives were sitting down with Jeffries. And their rejoinder to that in their reply brief is that's true, but you cite an article saying, you know, analysts don't typically wait a month. Okay. And we're talking about the earnings, you know, between the earnings call on October 31st to November 20th. I thought it was the 24th. It is the 24th because they plead that date on purpose. They use the 24th because it's the furthest out. But if you actually read the Jeffries Report that's in the record, it was published on the 21st. And what matters is the allegation from former employee number two, and this is the Rule 9 part. What does Rule 9 require? Who, where, when, what? The Ws from Rule 9, right? The when here matters a lot. They allege that the meeting where former employee number two heard from a senior executive at Boeing, we're shutting it down. They don't have a precise date on that. They say it was mid-November, approximately two weeks before Thanksgiving. Okay. So, what, 10 days before Thanksgiving or 16 days before Thanksgiving? Meetings on November 21st, or the report gets written on the 21st, goes published on the 21st, goes to investors on the 24th. Thanksgiving is the 28th that year. Okay. So, if you build that timeline out, you need to know when the meeting took place. You need to know, did the meeting take place before or after the alleged meeting with former employee number two and the Boeing executive? And it's real close in the timeline. And when you look at the Jeffries Report, I submit to you, you read that Jeffries Report and you don't say it's a fair presumption that they wrote it the day after they had the meeting. I say they start. I don't know. I don't know the answer to that, but it's not my burden on pleading under Rule 9. Well, they have evidence, basically, that says that generally an analyst is not going to wait days to write a report like that. It's going to be almost simultaneous. Is there anything to counter that? Do you dispute that? Yeah. I mean, I take that as rank speculation. Do you not make a timely report in this case? I take that as rank speculation that doesn't satisfy Rule 9. Right? There's a specific meeting that requires. What the practice in the industry is with analysts on when they disseminate information that's highly relevant. Not in the record. I mean, I can tell you what I think. So that's just speculation. They didn't put any evidence in on that. They put in an article by a plaintiff's lawyer about how to plead around Janice. I mean, that, to me, is not anything more than somebody else standing up here telling you. Did you rebut that with anything? It was in their reply brief. Okay. I think. I'm sorry. I don't know. I think that's right. I think it's in their reply brief. And to me, what I'm saying about that is if you look at the Jeffers report, you realize that Rule 9 really does matter here. Because the test under Janice is control. Do you control the statement? And without knowing when the meeting happened relative to the meeting with the Boeing executive that they allege, you don't know if Tom Gentile and Jose Garcia are sitting down with the executives. Or, I'm sorry, the analysts at Jeffries before or after somebody at Boeing has allegedly said, we're out. We're done. We're shutting it down. You don't know that. And Rule 9 matters because they can't control the statement at that point. So of the who, what, when, where, you think the timing is? I think the when, in this case, is sort of clear. I think the what matters, too. Because if you look at that report, it's an analyst opinion. Right? It's takeaways from the spirit management with the CFO and the CEO in the meeting. Yes. I agree with that. That's the title of it. Right. And then if you look at what they say, these are our takeaways. Well, takeaway by definition is going to be a summary full of my opinions about what I heard and what was said. If I give you my takeaways, it's my take on the meeting. It's not the person who was in the meeting's take necessarily. It's not exactly what they said. It's my view of what was said. That's the one piece of the takeaway. Then they say, well, it's spirit's targets are the words that are around in there. Well, it's also in the takeaways. I read that and I don't read that to per se say, well, this means that this is what spirit said. This is what Jefferies is projecting to its investors after a meeting with spirit. And it's a long report that an analyst puts together. And I submit to you to your question about timing. This is a pretty detailed, pretty long report. And in my experience, I said it's not in the record, but what do I think? In my experience with dealing with the analyst on things like this, they start with the meeting with the CEO. They do some legwork. They start with the meeting with the CEO. They do more legwork. And this time is way too compressed for that to have happened. I don't know when the meeting happened. It's not my burden to put it in the pleading when the meeting happened. It's their Rule 9 burden to say when it happened. So I don't think that that gets there. I don't think that that saves anything. I think the district court got that right to say that doesn't save anything. Let me address. Actually, I'm out of time. Are there any other questions I can address? Okay.  Thank you, Your Honors. So this matter will be submitted. I do want to say that I thought both sides were absolutely stellar. I don't want to give you all a big head. But I really thought they were excellent. And I thought your arguments today were equally helpful. So let's see. We're adjourned and subject to recall, I think. Thank you.